# No. 23-12929

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

————————

MARC SCHULTZ, individually and
on behalf of all others similarly situated,

*Plaintiff-Appellee,*

v.

EMORY UNIVERSITY,

*Defendant-Appellant.*

————————

On Appeal from the United States District Court for the Northern
District of Georgia, No. 1:20-cv-2002-TWT

————————

## APPELLANT'S OPENING BRIEF

————————

David L. Balser                 Paul Alessio Mezzina
Brandon R. Keel                 Joshua N. Mitchell
Timothy Lee                     KING & SPALDING LLP
Elliott A. Foote                1700 Pennsylvania Avenue NW
KING & SPALDING LLP             Washington, DC 20006
1180 Peachtree Street NE        (202) 737-0500
Atlanta, GA 30309               pmezzina@kslaw.com
(404) 572-4600

*Counsel for Appellant*

November 16, 2023

*Marc Schultz v. Emory University*, No. 23-12929

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In accordance with 11th Cir. Rule 26.1-1(a), the following is a list of all known trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations with an interest in the outcome of this case or appeal:

1.  Balser, David L., counsel for Defendant-Petitioner Emory University

2.  Brennan, Lauren KW, counsel for Plaintiff-Respondent Marc Schultz

3.  Coleman, Edward A., counsel for Plaintiff-Respondent Marc Schultz

4.  Emory University, Defendant-Petitioner

5.  Foote, Elliott A., counsel for Defendant-Petitioner Emory University

6.  Francis, James A., counsel for Plaintiff-Respondent Marc Schultz

7.  Francis Mailman Soumilas, P.C., counsel for Plaintiff-Respondent Marc Schultz

8.  Keel, Brandon R., counsel for Defendant-Petitioner Emory University

9.  King & Spalding LLP, counsel for Defendant-Petitioner Emory University

10. Kurowski, Daniel J., counsel for Plaintiff-Respondent Marc Schultz

*Marc Schultz v. Emory University*, No. 23-12929

11.   Lee, Timothy, counsel for Defendant-Petitioner Emory University

12.   Lewis Saul & Associates, P.C., counsel for Plaintiff-Respondent Marc Schultz

13.   Martindale-Jarvis, Travis B., counsel for Plaintiff-Respondent Marc Schultz

14.   Mezzina, Paul Alessio, counsel for Defendant-Petitioner Emory University

15.   Mitchell, Joshua N., counsel for Defendant-Appellant Emory University

16.   Sand, Jeffrey, counsel for Plaintiff-Respondent Marc Schultz

17.   Sartell, Jordan M., counsel for Plaintiff-Respondent Marc Schultz

18.   Saul, Lewis J., counsel for Plaintiff-Respondent Marc Schultz

19.   Schultz, Marc, Plaintiff-Respondent

20.   Searles, David A., counsel for Plaintiff-Respondent Marc Schultz

21.   Skipton, Edward, counsel for Plaintiff-Respondent Marc Schultz

22.   Soumilas, John, counsel for Plaintiff-Respondent Marc Schultz

23.   Hon. Thrash, Thomas W., Jr., District Court Judge

24.   Weiner & Sand LLC, counsel for Plaintiff-Respondent Marc Schultz

*Marc Schultz v. Emory University*, No. 23-12929

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Emory University certifies that it is not a publicly held corporation, it has no parent company, and no publicly held company has 10% or greater ownership in Emory University.

Date: November 16, 2023

_s/Paul Alessio Mezzina_
Paul Alessio Mezzina
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
pmezzina@kslaw.com

*Counsel for Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is warranted because, as this Court recognized in granting Emory's petition for review, this appeal presents important and recurring issues concerning class certification under Fed. R. Civ. P. 23(b)(3).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
    CORPORATE DISCLOSURE STATEMENT .............................. C-1

STATEMENT REGARDING ORAL ARGUMENT .................................... i

TABLE OF AUTHORITIES .................................................... iii

INTRODUCTION ...................................................................... 1

JURISDICTION ...................................................................... 5

STATEMENT OF THE ISSUES .................................................. 6

STATEMENT OF THE CASE .................................................... 6

    A.    Factual Background .................................................. 6

    B.    Procedural History ................................................ 13

STANDARD OF REVIEW .................................................... 17

SUMMARY OF ARGUMENT .................................................. 18

ARGUMENT ...................................................................... 21

I.    Common issues do not predominate with respect to the
    terms of class members' thousands of implied contracts. ............ 23

II.    Common issues do not predominate because plaintiff
    failed to present a viable classwide damages model. ................... 34

    A.    The district court failed to undertake a rigorous
        analysis of plaintiff's damages approach. ........................... 35

    B.    Plaintiff's failure to present a viable classwide
        damages model precludes class certification. ....................... 39

III.    The district court abused its discretion by certifying a
    class without resolving concerns about its manageability. ........... 48

CONCLUSION ...................................................................... 54

# TABLE OF AUTHORITIES*

## Cases

*Am. Honda Motor Co. v. Allen*,
  600 F.3d 813 (7th Cir. 2010)................................................................37

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)....................................................................22, 23

*Arredondo v. Univ. of La Verne*,
  341 F.R.D. 47 (C.D. Cal 2022) ..........................................................41

*Arredondo v. Univ. of La Verne*,
  618 F. Supp. 3d 937 (C.D. Cal. 2022) ...........................................42, 51

*Axiom Inv. Advisors, LLC v. Deutsche Bank AG*,
  2018 WL 4253152 (S.D.N.Y. Sept. 6, 2018) ......................................30

*Babineau v. Fed. Express Corp.*,
  576 F.3d 1183 (11th Cir. 2009)...........................................................45

*Bazemore v. Jefferson Cap. Sys., LLC*,
  827 F.3d 1325 (11th Cir. 2016)...........................................................25

*Beaird v. NRT Tex., Inc.*,
  2009 WL 10728229 (D.N.J. Jan. 16, 2009) ........................................30

*Behrend v. Comcast Corp.*,
  655 F.3d 182 (3d Cir. 2011) ...............................................................44

*Bishop v. Shorter Univ., Inc.*,
  2015 WL 13753710 (N.D. Ga. June 4, 2015)................................19, 30

*Brown v. Electrolux Home Prods., Inc.*,
  817 F.3d 1225 (11th Cir. 2016)...................................................*passim*

*Butts County v. Jackson Banking Co.*,
  60 S.E. 149 (Ga. 1908) ................................................................30, 31

---

* Authorities upon which we chiefly rely are marked by asterisks.

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ...................................................... 21

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3d Cir. 2013) ............................................ 49

*Carriuolo v. Gen. Motors Co.*,
823 F.3d 977 (11th Cir. 2016) ......................................... 45

*Castano v. Am. Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) ............................................ 52

\* *Cherry v. Dometic Corp.*,
986 F.3d 1296 (11th Cir. 2021) .......................... 4, 16, 48, 49

\* *Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ............................................... *passim*

*Converse v. Vizio, Inc.*,
2020 WL 2922490 (W.D. Wash. June 3, 2020) ..................... 29

*Cordoba v. DIRECTV, LLC*,
942 F.3d 1259 (11th Cir. 2019) ............................. 17, 22, 52

\* *Dixon v. Univ. of Miami*,
75 F.4th 1204 (11th Cir. 2023) ............................. 4, 5, 27, 44

*Eaves v. J.C. Bradford & Co.*,
326 S.E.2d 830 (Ga. Ct. App. 1985) ................................. 31

*Eddlemon v. Bradley Univ.*,
65 F.4th 335 (7th Cir. 2023) ........................................... 38

*Emory Univ. v. Schultz*,
No. 23-90016 (11th Cir. Sept. 7, 2023) ........................... 6, 17

*Evans v. Brigham Young Univ.*,
2023 WL 3262012 (10th Cir. May 5, 2023) ...................... 31, 51

*Garcia De León v. N.Y. Univ.*,
2022 WL 2237452 (S.D.N.Y. June 22, 2022) ....................... 51

iv

*Grady Mem'l Hosp. Corp. v. Hayes,*
  801 S.E.2d 55 (Ga. Ct. App. 2017)......................................................25

*Huddleston Concrete Co. v. Safeco Ins. Co.,*
  368 S.E.2d 117 (Ga. Ct. App. 1988)...................................................30

*In re Hydrogen Peroxide Antitrust Litig.,*
  552 F.3d 305 (3d Cir. 2008) ...............................................................37

*In re Univ. of San Diego Tuition & Fees COVID-19 Refund Litig.,*
  2023 WL 3773942 (S.D. Cal. May 23, 2023) .......................................40

*Jackson v. Easters,*
  379 S.E.2d 610 (Ga. Ct. App. 1989)...................................................25

*Jansen v. Emory Univ.,*
  440 F. Supp. 1060 (N.D. Ga. 1977)................................................46, 47

*Keystone Land & Dev. Co. v. Xerox Corp.,*
  94 P.3d 945 (Wash. 2004) ...................................................................30

*Legacy Acad., Inc. v. JLK, Inc.,*
  765 S.E.2d 472 (Ga. Ct. App. 2014)...................................................44

*Lindner v. Occidental Coll.,*
  2020 WL 7350212 (C.D. Cal. Dec. 11, 2020)......................................27

*Little v. Grand Canyon Univ.,*
  2021 WL 4263715 (D. Ariz. 2021) ......................................................51

*Little v. T-Mobile USA, Inc.,*
  691 F.3d 1302 (11th Cir. 2012)...........................................................17

*Mahon v. Chi. Title Ins. Co.,*
  296 F.R.D. 63 (D. Conn. 2013).............................................................33

* *Michel v. Yale Univ.,*
  2023 WL 1350220 (D. Conn. Jan. 30, 2023) ...........................41, 42, 43

*Rockford Principals & Supervisors Ass'n*
  *v. Bd. of Educ. of Rockford Sch. Dist. No. 205,*
  721 F. Supp. 948 (N.D. Ill. 1989)........................................................33

*Rynasko v. New York University,*
  63 F.4th 186 (2d Cir. 2023) .................................................................. 45

*Scott v. Mamari Corp.,*
  530 S.E.2d 208 (Ga. Ct. App. 2000) ...................................................... 30

*Sher v. Raytheon Co.,*
  419 F. App'x 887 (11th Cir. 2011) ......................................................... 37

*Taylor v. Sturgell,*
  553 U.S. 880 (2008) ............................................................................... 21

*Torres v. Elkin,*
  730 S.E.2d 518 (Ga. Ct. App. 2012) ...................................................... 25

*Tracy v. Elekta, Inc.,*
  2023 WL 4677021 (N.D. Ga. Mar. 31, 2023) ........................................ 32

\* *Vega v. T-Mobile USA, Inc.,*
  564 F.3d 1256 (11th Cir. 2009) ...................................................... *passim*

\* *Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) ....................................................................... *passim*

*Woodruff v. Ga. State Univ.,*
  304 S.E.2d 697 (Ga. 1983) .................................................................... 46

**Statutes**

28 U.S.C. § 1292 ....................................................................................... 6

28 U.S.C. § 1332 ....................................................................................... 5

**Rules**

Fed. R. Civ. P. 23(a) ........................................................................... 18, 22

Fed. R. Civ. P. 23(b) ....................................................................... *passim*

Fed. R. Civ. P. 23(f) ........................................................................ *passim*

## Executive Orders

Ga. Exec. Order No. 03.14.20.01 .................................................................... 12

Ga. Exec. Order No. 03.23.20.01 .................................................................... 12

Ga. Exec. Order No. 03.26.20.02 .................................................................... 12

Ga. Exec. Order No. 04.01.20.01 .................................................................... 12

Ga. Exec. Order No. 04.02.20.01 .................................................................... 13

## Other Authorities

Opp.,
*Emory Univ. v. Schultz*,
No. 23-90016 (11th Cir. July 10, 2023), ECF 9 ........................... 33, 45

*Emory Advantage*,
Emory Univ. Off. of Fin. Aid, https://tinyurl.com/yn9u24sa ............... 9

Fed. R. Civ. P. 23
advisory committee's note to 2003 amendment ................................... 52

Decl. of Gareth Macartney, Ph.D.,
*Michel v. Yale Univ.*,
No. 3:20-cv-1080 (D. Conn. Aug. 19, 2022), ECF 131-4 ................... 42

Compl.,
*Schultz v. Emory Univ.*,
No. 1:20-cv-2661 (N.D. Ga. June 24, 2020), ECF 1 ........................... 13

1 Williston on Contracts § 1:5 (4th ed.) ................................................... 24

**INTRODUCTION**

In March 2020, as both the scope of the COVID-19 pandemic and the danger it posed became clear, Emory University—like universities across the country and around the world—temporarily paused in-person classroom instruction, closed on-campus residences, and offered its classes remotely until its campuses could be made safe again for ordinary activities. Emory refunded housing and meal plan fees, paid to ensure safe transportation for students, and even provided housing and food at its own expense to students who were unable to return home. Emory did all this proactively in an effort to protect its students, faculty, and staff from unnecessary exposure to a deadly contagion, while still allowing its students to continue progress towards their degrees notwithstanding the pandemic. Emory took these actions mere days before an increasingly stringent set of Georgia executive orders would have required the same result.

This putative class action soon followed. Plaintiff Marc Schultz, the father of an Emory undergraduate, asserted several claims arising out of Emory's closure of its campuses and transition to remote learning during the pandemic. Following motion practice that narrowed plaintiff's

complaint, the district court certified a class of all persons who made tuition payments to Emory, personally or on behalf of others, for in-person instruction during the Spring 2020 semester. The class certification was limited to plaintiff's claim that Emory breached an unwritten, implied-in-fact contractual promise to provide students with *in-person* classes in exchange for tuition. Because Emory had about 15,000 students in Spring 2020, and multiple individuals may have made tuition payments for a given student, the class likely comprises tens of thousands of individuals. This Court granted Emory's petition for permission to appeal the class-certification order under Federal Rule of Civil Procedure 23(f).

In leaping to class certification, the district court made three fundamental errors that render its decision an abuse of discretion.

***First***, the court assumed that it could determine, in one stroke, not only whether Emory entered into implied contracts with thousands of class members, but also—and critically—whether every one of those contracts prohibited Emory from transitioning classes to remote learning for seven weeks in response to a global pandemic. That is wrong. Under Georgia law, the terms of any implied contract between a university and

an individual tuition payor must reflect a meeting of the minds or mutual assent, which means they must be determined based on the specific communications and understandings that existed between the university and that individual.  While plaintiff maintains that Emory impliedly promised to hold his daughter's classes in person no matter what, many other tuition payors likely understood (and preferred) that Emory would seek to both educate students and keep them safe from harm. Ascertaining the terms of these payors' thousands of implied contracts will require individualized inquiries.

***Second***, despite recognizing that plaintiff needed to provide a classwide damages model, the district court failed to rigorously analyze whether he could prove damages on a classwide basis.  As Emory's expert noted, plaintiff's expert damages report was so general and vague that it was akin to asserting that damages could be calculated because math exists.  Indeed, plaintiff's expert had submitted an identical report in a similar case against Yale University, and the court there rejected his methodologies as unreliable.  Yet the district court here failed to analyze or weigh the parties' expert opinions at all.  Instead, it treated the mere existence of those competing opinions as sufficient to support class

3

certification, while improperly shifting the burden of proof to Emory to identify "binding" authority requiring that the class *not* be certified. R.98 at 24–25.

***Third***, the court certified the class despite concluding that it presented "'unusually difficult manageability problems'" and that "ascertaining the putative individual class members" might not be "a manageable endeavor." R.98 at 29 (quoting *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021)). The court's concerns were valid: Emory's records do not contain information about individual tuition payors, so identifying those individuals would require a detailed inquiry into each of many thousands of separate tuition payments (which even then might not be sufficient to identify the payor, given the nature of tuition payments and the limitations in banking records). But instead of resolving these manageability concerns *before* certification, as this Court's precedents require, the court rushed to certify the class while deferring these important manageability issues to a later day.

As this Court recently observed, "[t]he pandemic forced students of all ages to learn from behind their computer screens for a period of time." *Dixon v. Univ. of Miami*, 75 F.4th 1204, 1212 (11th Cir. 2023). But

Emory's faculty, staff, and administrators made extraordinary efforts to manage the temporary transition to remote learning and enable students (including plaintiff's daughter) to continue to receive an Emory education and progress towards completion of their degrees. While Emory shares the Court's "sympathy for those students whose educations and relationships were affected" by "the hardships created by the pandemic," *id.* at 1212–13, plaintiff's unhappiness with Emory's pandemic response does not entitle him to represent a class of many thousands of tuition payors who have expressed no similar dissatisfaction. This Court should reverse the district court's class-certification decision.

## JURISDICTION

The district court had jurisdiction over this putative class action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because plaintiff and Emory are citizens of different states and because plaintiff alleged that class members' claims exceeded $5,000,000 in the aggregate. This Court granted Emory's petition for permission to appeal the district court's class-certification order under Federal Rule of Civil Procedure 23(f). *Emory Univ. v. Schultz*, No. 23-90016 (11th Cir. Sept. 7,

2023), ECF 12. This Court therefore has jurisdiction of this interlocutory appeal under 28 U.S.C. § 1292(e) and Rule 23(f).

## STATEMENT OF THE ISSUES

1.    Did the district court abuse its discretion by concluding that it could determine, in one stroke based on common evidence, whether Emory impliedly contracted with many thousands of tuition payors to provide in-person education during a pandemic, regardless of class members' individual circumstances and understandings?

2.    Did the district court abuse its discretion by concluding that damages from Emory's temporary transition to remote learning can be measured on a classwide basis and consistent with plaintiff's theory of liability, without any analysis of plaintiff's proffered damages methodologies?

3.    Did the district court abuse its discretion by certifying a class that it recognized presented "unusually difficult manageability problems" without weighing those concerns under Rule 23(b)(3)(D)?

## STATEMENT OF THE CASE

### A.    Factual Background

***Emory and its financial arrangements with students.***
Appellant Emory University is a leading, internationally recognized

6

private research university. It operates nine separate academic units offering more than 250 different undergraduate and graduate degree programs to more than 15,000 students across two campuses. R.85 at 5–6; R.85-20 at 26:1–10. The nine academic units are the Emory College of Arts and Sciences, Oxford College, the Laney Graduate School, the Goizueta Business School, the School of Law, the School of Medicine, the Nell Hodgson Woodruff School of Nursing, the Rollins School of Public Health, and the Candler School of Theology. R.85-21 at 1–2.

Each of Emory's nine academic units has its own leadership, administration, faculty, staff, facilities, and expectations for students. R.85-20 at 26:1–10, 38:22–39:21. Emory's marketing materials also vary from program to program, and each unit is responsible for its own messaging to current and prospective students. R.85-22 at 13:10–21, 56:19–62:9, 90:1–6, 133:12–19, 138:3–16. Emory maintains websites and social media accounts and publishes a variety of printed materials, and its personnel participate in countless meetings and conversations (both formal and informal) with current and prospective students. R.85-23 ¶¶ 5–6.

Like most private U.S. universities, Emory charges tuition, and it does so in amounts that vary across its academic units and by degree program. But the tuition received does not cover the cost of educating its students, particularly in light of Emory's financial aid and scholarship programs, and so Emory uses contributions from donors and distributions from its endowment to avoid operating at a loss. R.86-4 at 53:19–24, 143:2–146:24, 191:7–192:7. Leading up to the COVID-19 pandemic, Emory charged students the same tuition for classes during the fall/spring academic year regardless of whether instruction was provided in person or remotely. R.85-20 at 141:17–142:17.

Emory also charges fees for offerings and services provided by the university. Like tuition costs, these fees vary by academic unit and program, and include application fees, orientation fees, administrative fees, laboratory fees, course fees, program fees, technology fees, and other fees designated by specific programs. R.85-21 at 3–5.

Most Emory students receive some form of financial aid. Each student's financial aid package is an individualized mix, often including scholarships and grants, which students are not required to repay. *See generally* R.86-5. Each financial aid package takes into account the

8

student's expected family contribution, and Emory helps students cover any remaining tuition charge with a combination of grants, work-study programs, and (as of Spring 2020) loans. For its undergraduate students, Emory commits to covering 100% of financial need through these sources of funding. *See Emory Advantage*, Emory Univ. Off. of Fin. Aid, https://tinyurl.com/yn9u24sa (last visited Nov. 16, 2023).

Emory receives payments for tuition and fees via online ACH payments, through third-party services and wire transfers, and occasionally by check. R.85-37 ¶ 9. Students may make online payments themselves through the Emory student portal, called OPUS, and they may also create "guest" credentials for other individuals who can then submit payments for the student's account. R.85-37 ¶¶ 10–13. However, Emory does not obtain or keep identifying information about the users of these guest accounts—they are not associated, for example, with an email address. R.85-37 ¶ 14. Nor do Emory's bank records indicate where payments originated. In fact, for ACH payments (which account for the bulk of tuition payments), Emory's bank records aggregate multiple payments into larger batched deposits that contain no identifying information about any individual payor. R.85-37 ¶¶ 17–18.

*COVID-19 and Emory's response.*    In early 2020, the global pandemic caused by the COVID-19 virus reached the United States.  *See* R.85-11 ¶ 68.  By early March, there were hundreds of confirmed COVID-19 cases across the country.

Emory's 2020 spring break was scheduled to take place from March 9 through March 13.  During that week, the number of reported COVID-19 cases ballooned nationwide.  In an effort to slow the contagion, both governments and private businesses began canceling in-person gatherings; professional and collegiate sporting leagues cancelled their seasons and playoffs; and colleges and universities suspended in-person classes, with many moving to remote, online teaching.

Against that backdrop, Emory sought to help its students, faculty, and staff avoid the risks of transmitting or contracting COVID-19 while enabling students to continue to pursue their degrees without interruption.  R.85-20 at 99:18–100:12, 112:5–113:13.  To that end, on March 11, 2020, Emory announced that it would extend spring break by a week, allowing it time to transition its classes to remote learning.  R.85-11 ¶ 69.  For the remaining seven weeks of the Spring 2020 semester, apart from certain clinical-education classes offered to students who fell

under Georgia state exceptions for workers providing emergency services, Emory's classes were provided primarily via remote learning. R.85-20 at 63:24–64:14.

Emory halted its regular housing program and dining services, and it promptly issued pro rata refunds of room and board payments and other fees it had received for the remainder of the Spring 2020 semester. R.85-20 at 159:6–10. Emory also made significant investments in helping its students during the pandemic. It paid to have students' rooms packed, and it paid travel stipends to get students home safely. R.85-20 at 113:15–115:4, 158:5–159:15. For those students who were unable to return home, Emory continued to provide rooms and delivered meals at its own expense. R.85-20 at 108:21–109:7. Emory also bolstered its mental health offerings for students, including by providing round-the-clock access to telehealth services and expanding IT capabilities to meet increased demand. R.85-20 at 109:8–110:3; R.86-4 at 130:8–12, 209:16–210:20. And it created a hardship fund to assist students who lacked access to computers or the Internet. R.86-4 at 103:1–5, 162:18–163:6. In total, Emory provided more than $21 million in refunds and hardship assistance in Spring 2020 alone. R.86-6.

Emory was not acting in a vacuum. In addition to its own concern for the safety of its students, faculty, and staff, Emory was—like institutions around the world—responding to a rapidly shifting regulatory landscape. During March and April of 2020, Georgia governor Brian Kemp promulgated a series of increasingly restrictive executive orders. On March 14, 2020, Georgia declared a public health emergency due to the spread of COVID-19 in the state. Ga. Exec. Order No. 03.14.20.01. On March 23—the day Emory began providing classes remotely—Governor Kemp issued an order requiring that "no business, establishment, corporation, non-profit corporation, or organization shall allow more than ten (10) persons to be gathered at a single location if such gathering requires persons to stand or to be seated within six (6) feet of any other person." Ga. Exec. Order No. 03.23.20.01. Within the next two weeks, Georgia closed its public schools, first until April 24 and then through the end of the academic year. Ga. Exec. Order No. 03.26.20.02; Ga. Exec. Order No. 04.01.20.01. And on April 2, Georgia issued a statewide stay-at-home order limiting non-essential services (which included most of Emory's academic programs) to offering "minimum basic operations," which included the "minimum necessary

activities to facilitate … members or patrons being able to participate remotely from their residences." Ga. Exec. Order No. 04.02.20.01.

The COVID-19 pandemic continued into and through the Fall 2020 semester. Accordingly, when Emory students signed up for Fall 2020 classes, they expressly agreed that they understood Emory would not provide full or partial tuition refunds regardless of whether classes were offered remotely or in person. R.85-20 at 157:12–21. More than 90% of non-graduating students, notably including plaintiff's daughter, chose to re-enroll on those terms—a percentage that is consistent with re-enrollment rates before the pandemic. R.86-3 at 26–28.

### B. Procedural History

Plaintiff is the father of a former Emory student who attended the Emory College of Arts and Sciences as an undergraduate, including in Spring 2020, and who graduated in 2022. *See* R.85-2 at 37:1–10.

Plaintiff filed his initial class-action complaint in June 2020. *See* Compl., *Schultz v. Emory Univ.*, No. 1:20-cv-2661 (N.D. Ga. June 24, 2020), ECF 1. In September 2020, plaintiff and former plaintiff Jane Doe filed a consolidated class-action complaint asserting claims for breach of express contract (Doe) and implied contract (plaintiff), unjust

13

enrichment, and money had and received. *See* R.31. Emory moved to dismiss that complaint, and the district court dismissed the breach of express contract claim without prejudice and the unjust enrichment claim with prejudice. R.44 at 20–21.

Following that dismissal, in February 2021, plaintiff filed his operative amended complaint. *See* R.48. The amended complaint dropped former plaintiff Doe and her express-contract claim and asserted claims for (1) breach of implied-in-fact contract and (2) money had and received. R.48 ¶¶ 109–23. As relevant to the first claim, plaintiff alleges that Emory breached an implied agreement with all tuition payors for students across all nine academic units to provide "in-person, on-campus educational services." R.48 ¶¶ 95, 100(b). He claims this agreement was implied in Emory's "publications, including brochures, advertisements, and other promotional materials, and [Emory's] usual and customary practice of providing on-campus courses." R.48 ¶¶ 46–47, 112–13.

On June 15, 2023, the district court granted, in part, plaintiff's motion for class certification. It held that plaintiff had satisfied the requirements of Rule 23, but only as to his implied-contract claim and

only with respect to tuition payments.  It certified the following class as to that claim:

> All people paying Emory tuition, in whole or in part, and personally or on behalf of others, for in-person instruction during the Spring 2020 academic term.

R.98 at 29.  In its certification order, the district court made three rulings that Emory challenges in this appeal:

***First***, the court ruled that "common questions predominate over any individualized questions" with respect to whether Emory breached an implied contract with each class member.  R.98 at 19.  It reasoned that even though class members may have been exposed to different marketing materials and had different expectations about their on-campus experience, Emory's "customary practice of providing in-person instruction" could nevertheless create an identical implied contract with *all* class members.  R.98 at 18–19.  And it brushed aside Emory's argument "that the *terms* of an implied contract cannot be shown with common evidence."  R.98 at 18.

***Second***, without analyzing the parties' arguments, the court ruled that plaintiff had carried his burden to "present[] a classwide model capable of determining damages" merely because his expert, Dr. Gareth

Macartney, disagreed with Emory's critiques (and those of Emory's expert, Dr. Benjamin Wilner) and because Emory had cited no "binding" authority "that would compel a finding of a failure to show classwide damages." R.98 at 22–25. The court reached that conclusion despite acknowledging that "individualized issues abound" with respect to determining damages, that plaintiff's failure to respond to Emory's arguments came "very close to abandonment of the issue," and that the court hearing a parallel case against Yale had rejected Dr. Macartney's damages methodologies. R.98 at 21, 24–25.

*Third*, the court found that the class "appear[ed] to present 'unusually difficult manageability problems'" but certified the class anyway, without weighing or resolving those problems. R.98 at 29 (quoting *Cherry*, 986 F.3d at 1304). It acknowledged that because "Emory records do not specifically identify the individual people paying Emory tuition … on behalf of" students, "[a]scertaining the identities of class members will presumably require individual inquiries into every" payment. R.98 at 8. In light of those concerns, the court ordered plaintiff to submit a "detailed plan" for addressing manageability problems within thirty days. R.98 at 29. Yet, despite having "serious doubts as to whether

16

ascertaining the putative individual class members … is a manageable endeavor," the court certified the class and proposed to address those concerns *after* certification.  *Id.*[1]

Emory timely petitioned this Court for permission to appeal the class-certification order under Rule 23(f), which this Court granted.  *See Emory Univ.*, No. 23-90016 (11th Cir. Sept. 7, 2023).

## STANDARD OF REVIEW

This Court reviews a class-certification order for abuse of discretion.  *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1267 (11th Cir. 2019).  A district court abuses its discretion if it "applies an incorrect legal standard, follows improper procedures in ruling on class certification, makes clearly erroneous factfindings, or applies the law in an unreasonable or incorrect manner."  *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1305–06 (11th Cir. 2012) (quotation marks omitted).

---

[1]  On July 17, 2023, plaintiff submitted his manageability plan.  R.99. As Emory pointed out in response, that "plan" failed to address the manageability issues Emory and the district court had identified; instead, it only raised further questions.  *See* R.100.  The district court said it would treat Emory's response as a motion to decertify the class. R.101.  As of the filing of this brief, that motion remains pending.

## SUMMARY OF ARGUMENT

Class treatment is appropriate only when a court determines, after rigorous analysis, that the plaintiff has made an affirmative showing that the proposed class satisfies every requirement of Rule 23(a) and at least one requirement of Rule 23(b).  Here, the district court certified the class under Rule 23(b)(3), requiring plaintiff to show that common questions predominate over individualized ones and that a class action is superior to other methods of fairly and efficiently adjudicating the controversy. The court abused its discretion in concluding that plaintiff had satisfied that standard.

**I.**  Plaintiff cannot satisfy the predominance requirement on his implied-in-fact contract claim.  Even assuming plaintiff could show that Emory entered into an implied contract with every person paying tuition for each of its roughly 15,000 students, he cannot use common evidence to establish, in one stroke, the essential terms of those thousands upon thousands of implied contracts.  Of particular importance here, he cannot prove with common evidence that every such contract included an identical promise by Emory to provide in-person classroom instruction in *all* circumstances, even when doing so would endanger students.  Georgia

law provides that an implied contract must reflect "a meeting of the minds or mutual assent." *Bishop v. Shorter Univ., Inc.*, 2015 WL 13753710, at *6–7 (N.D. Ga. June 4, 2015) (collecting cases). Therefore, determining whether any given implied contract included such a promise would require an individualized inquiry into the specific information and communications on which the payor relied and the understanding and expectations the payor formed as a result. The answers to those questions are bound to differ significantly across Emory's nine academic units, 250 degree programs, 15,000 students, and many thousands of tuition payors.

**II.** Plaintiff also failed to show predominance because he did not provide a viable classwide damages model, which the district court correctly recognized was necessary to prevent individual damages questions from overwhelming any common issues. Instead of the required damages model, what plaintiff proffered was a generalized outline of an approach his expert might take, using one of two similarly generalized economic methods. The district court recognized that plaintiff's presentation on this issue was so deficient it verged on abandonment. Yet it declined to analyze or weigh the parties' competing

expert testimony, and it improperly shifted the burden to Emory to produce "binding" authority precluding class certification. The court also ignored a persuasive decision from another district court that considered a nearly identical report by plaintiff's damages expert and rejected his methodologies as unreliable. The court failed to grapple with evidence that Emory historically charged the same tuition for remotely provided and in-person classes during the fall and spring semesters, and that the vast majority of Emory students chose to re-enroll at Emory's ordinary tuition rates in Fall 2020 despite acknowledging that no tuition would be refunded if classes were provided through remote learning. And it overlooked that plaintiff's expert's approach to damages—which depends on persuading a jury that Emory's remotely provided classes were worth less because they resulted in an "inferior" educational experience, R.78-4 ¶ 14—is inconsistent with Georgia law, which bars courts from second-guessing the quality or value of universities' academic offerings.

III. The district court also erred by certifying the class without resolving serious concerns about manageability. The court expressed grave doubts about whether there would be a manageable process for identifying class members. Emory's records do not identify individuals

making tuition payments on behalf of students, so identifying those individuals will be a difficult if not impossible (and, again, highly individualized) endeavor. Yet despite acknowledging those concerns, the court certified the class without addressing them and postponed consideration of manageability until *post*-certification proceedings. Certifying a class in these circumstances was procedurally improper and an abuse of discretion.

## ARGUMENT

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). The Supreme Court has thus emphasized that courts must closely scrutinize requests for class treatment. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). Such scrutiny is vital, because Rule 23's requirements are grounded in principles of due process. *Taylor v. Sturgell*, 553 U.S. 880, 901 (2008). Class treatment affects not only the rights of defendants (who may have good defenses against individual class members that will go unvindicated), but also those of absent class members (who may lose

meritorious individual claims). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997) (Rule 23's requirements "focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives").

Accordingly, a plaintiff seeking to depart from the usual rule that litigation binds only the named parties bears the burden of affirmatively demonstrating that his case qualifies for class treatment, which means satisfying every requirement of Federal Rule of Civil Procedure 23(a) and at least one requirement of Rule 23(b). *Cordoba*, 942 F.3d at 1267. And Rule 23 does not set out a "mere pleading standard." *Wal-Mart*, 564 U.S. at 350. Instead, the plaintiff must demonstrate that Rule 23's requirements "are *in fact*" met—and courts must subject the plaintiff's attempt to make that showing to a "rigorous analysis." *Id.* at 350–51 (quotation marks omitted).

Here plaintiff sought, and the district court granted, class certification under Rule 23(b)(3), which required plaintiff to prove that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating

the controversy." Plaintiff thus had to first prove that class members' claims present at least one "common question[]" that, if adjudicated classwide, would "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Plaintiff was then required to prove that common questions would "predominate" over individual ones—a requirement that is "far more demanding" than just showing that a common question exists. *Amchem*, 521 U.S. at 624.

For the reasons discussed below, the district court failed to undertake the requisite "rigorous analysis" and abused its discretion in certifying plaintiff's proposed class. Each of the three errors explained below independently requires reversal.

## I. Common issues do not predominate with respect to the terms of class members' thousands of implied contracts.

The district court abused its discretion when it concluded that common issues would predominate over individual ones with respect to the "existence (or breach) of an implied contract" between Emory and each class member. R.98 at 21. The court reasoned that "Emory's customary practice of providing in-person instruction after the payment of tuition may give rise to an implied contract under Georgia law." R.98 at 18–19. It then leaped to the conclusion that "if Schultz and the

23

putative class members entered into an implied contract with Emory," then "such an implied contract will be common to all class members." R.98 at 19.

In doing so, the district court brushed aside the critically important question of the *terms* of any implied contract between Emory and a class member. The court seemed to believe that because plaintiff was alleging an implied contract rather than an express contract, he did not need to establish the contract's terms with specificity. It reasoned that because "Schultz does not allege that he can show the existence of the express terms of the putative implied contract," "Emory's argument that the *terms* of an implied contract cannot be shown with common evidence misses the mark." R.98 at 18.

That was error. Implied-in-fact contracts are not exempt from ordinary contract analysis, and a plaintiff cannot prove a breach of an implied contract without proving the specific terms the defendant allegedly breached. An implied-in-fact contract is "the same as an express contract, except that assent is not expressed in words, but is [inferred] from the conduct of the parties." 1 Williston on Contracts § 1:5 (4th ed.). And as with any other contract, the party claiming breach of

an implied contract must show not only "the existence of [the] implied contract," but also "the terms of said contract." *Grady Mem'l Hosp. Corp. v. Hayes*, 801 S.E.2d 55, 57 (Ga. Ct. App. 2017); *see also Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1330 (11th Cir. 2016) ("The party asserting the existence of a contract has the burden of proving its existence and its terms." (quoting *Jackson v. Easters*, 379 S.E.2d 610, 611 (Ga. Ct. App. 1989))); *Torres v. Elkin*, 730 S.E.2d 518, 523 (Ga. Ct. App. 2012) ("[C]ourts are certainly limited to those terms upon which the parties themselves have mutually agreed." (quotation marks omitted)).

Accordingly, in determining whether Emory is liable for breaching an implied contract with a class member, one central question will be whether the terms of any such implied contract required Emory to provide in-person instruction only under *ordinary* circumstances, or whether Emory implicitly promised that it would hold classes in person under *all* circumstances, even when doing so would be unsafe because it would put students, faculty, and staff at risk of contracting a deadly and highly communicable virus.  That question cannot be answered on a classwide basis using common evidence.

25

This Court's decision in *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256 (11th Cir. 2009), illustrates the problem. There, the plaintiff sought to represent a class of employees with no uniform written contract seeking to recover unpaid sales commissions. The Court held that common issues did not predominate because discovering the terms of each employee's contract would require individual inquiries into both "what the employee was told (and agreed to) with respect to compensation" and "the employee's subjective understanding of how he would be compensated." *Id.* at 1272. Both types of individual inquiries are required here, as ascertaining the terms of each class member's implied contract would require considering both the objective statements or conduct the member relied on and the member's subjective understanding of the specific contractual terms at issue.

***First***, the circumstances giving rise to any implied contract would differ from class member to class member. The district court seemingly concluded that it would be able to answer this crucial question about the implied contractual terms just by adverting to Emory's "customary practice" of holding classes in person when no obstacles to doing so existed, and that this would eliminate the need for any individualized

26

inquiries. R.98 at 14, 18–19. But customary practice alone cannot answer the question whether Emory was obligated to provide in-person instruction in the midst of a global pandemic. *Cf. Lindner v. Occidental Coll.*, 2020 WL 7350212, at *9 (C.D. Cal. Dec. 11, 2020) (college's customary practice suggested only that it would provide in-person instruction "under ordinary circumstances" (quotation marks omitted)). For example, it is undisputed that Emory's customary practices included the possibility that weather events or other disruptions might lead to classes being not just conducted remotely but canceled altogether—and that this information could be conveyed to students through non-uniform means, such as conversations with resident assistants. R.85-20 at 99:18–102:17.[2]

In the district court, plaintiff correctly recognized that the implied-contract claim would require consideration of more than just Emory's

---

[2] This Court recently held that, even assuming a university had expressly or impliedly promised "to provide in-person education," the university's reservation of the right "at any time to deny, revoke, or modify authorization to use any University facility or premises" allowed it to "temporarily transition[] to remote learning" "in response to the COVID-19 pandemic." *Dixon*, 75 F.4th at 1208–09. Emory is entitled to show that such authority was also part of any implied contract it entered into with an individual class member.

"customary practices."  In both his operative complaint and his class-certification motion, he claimed reliance on specific "promotional statements, handbooks, catalogues, and brochures" as evidence of the supposed terms of an implied contract.  R.77-1 at 16; *see also* R.77-1 at 3–4; R.77-3 to R.77-7; R.48 ¶¶ 23–42.  But plaintiff and his daughter both admitted that they had not seen *any* of the marketing materials cited in the complaint.  R.85-2 at 101:9–102:3, 115:4–123:2; R.85-15 at 86:12–89:19.  Nor is the language in the materials plaintiff cited uniform.  *See* R.77-3 to R.77-7; *see also* R.48 ¶¶ 30–42.

Indeed, the evidence showed that far from being uniform across the class, Emory's marketing and other communications varied significantly from school to school and from class member to class member.  Such communications occurred through numerous websites and social media accounts; a variety of printed materials; and countless conversations, presentations, and meetings with current and prospective students.  R.85-23 ¶¶ 6–9.  Each of Emory's nine academic units is responsible for its own website, news feed, and messaging and outreach.  R.85-22 at 13:9–21, 55:3–18, 56:19–52:9. 133:12–19, 138:3–16.  Each unit also provides its own acceptance letters, terms of admission, and enrollment

agreements. *See, e.g.*, R.85-26 to R.85-31; R.85-40 to R.85-42. And while some of Emory's marketing materials reference various benefits of campus life, few if any mention *in-person instruction* as one of those benefits. *See* R.44 at 12 ("The Amended Complaint highlights passages from the Defendant's website and catalog which describe the campus's physical beauty, the value of the school's community and residential life, and opportunities for student-faculty interaction.").

Consequently, even looking only to objective circumstances, it will be impossible to ascertain the critical terms of any implied contract without considering "individualized facts" about each class member's communications and interactions with Emory. *Vega*, 564 F.3d at 1272 (with no "common contract," proving the "essential terms" of class members' employment agreements would depend on individualized inquiries into, *e.g.*, "what [each] employee was told (and agreed to) with respect to compensation rules and procedures"). This is a bar to class certification. *See, e.g.*, *Converse v. Vizio, Inc.*, 2020 WL 2922490, at *3–4 (W.D. Wash. June 3, 2020) ("'objective manifestations of mutual assent'" to implied-contract terms could not be proved "on a classwide basis with common evidence" (quoting *Keystone Land & Dev. Co. v. Xerox Corp.*, 94

P.3d 945, 950 (Wash. 2004) (en banc))); *Axiom Inv. Advisors, LLC v. Deutsche Bank AG*, 2018 WL 4253152, at *9 (S.D.N.Y. Sept. 6, 2018) (proof of implied-contract terms "as manifested by the conduct of the parties … would have to be individualized"); *Beaird v. NRT Tex., Inc.*, 2009 WL 10728229, at *6–7 & n.14 (D.N.J. Jan. 16, 2009) (plaintiff would have to "prove what each sales associate experienced in his or her course of dealing with [defendant]").

**Second**, proving the terms of any class member's contract would also require an inquiry into that class member's understanding of the terms of the class member's agreement with Emory.  What class members understood about those terms matters, because under Georgia law an implied-in-fact contract must reflect "a meeting of the minds or mutual assent by the parties."  *Bishop*, 2015 WL 13753710, at *6–7 (collecting cases); *see also id.* at *6 ("[C]ontracts implied in fact depend upon the will of the parties to be bound …." (quoting *Butts County v. Jackson Banking Co.*, 60 S.E. 149, 152 (Ga. 1908))); *Scott v. Mamari Corp.*, 530 S.E.2d 208, 212 (Ga. Ct. App. 2000) ("[T]he law will not imply a promise contrary to the intention of the parties."); *Huddleston Concrete Co. v. Safeco Ins. Co.*, 368 S.E.2d 117, 120 (Ga. Ct. App. 1988) ("[A]n implied-in-fact contract …

is a true contract and requires a meeting of the minds." (emphasis omitted)).[3]

Consequently, class members cannot recover if they did not actually and reasonably believe that they were contracting for a guarantee that classes would be held in person no matter what. No doubt many class members expected and preferred that Emory would *not* hold classes in person if doing so would put students' lives and health at risk. And answering that question would require an "individualized inquiry into the subjective mindset of each" class member to ascertain whether the class member "paid tuition [for the associated student] to attend in-person classes, pandemic or not," or whether they instead "paid tuition [for the student] to attend classes unless a public health emergency broke out." *Evans v. Brigham Young Univ.*, 2023 WL 3262012, at *9 (10th Cir. May 5, 2023); *see also Vega*, 564 F.3d at 1272 (without a common written

---

[3] In this way, contracts implied in fact differ from "contracts implied in law," which are "obligations imposed by law as duties quite independent of the assent of the party held to be bound, and often in spite of his earnest dissent." *Butts County*, 60 S.E. at 152; *see Eaves v. J.C. Bradford & Co.*, 326 S.E.2d 830, 831 (Ga. Ct. App. 1985) (implied-in-fact contracts are "true contracts" requiring a meeting of the minds, whereas implied-in-law contracts "are implied by law without regard for the intent or assent of the parties"). Plaintiff here is alleging a contract implied in fact. *See, e.g.*, R.48 ¶ 116; R.98 at 18.

contract, proving "the essential terms" of class members' contracts would necessitate inquiries into each class member's "subjective understanding of how he would be compensated"); *Tracy v. Elekta, Inc.*, 2023 WL 4677021, at \*7 (N.D. Ga. Mar. 31, 2023) (plaintiffs pleaded an implied contract claim under Georgia law where they sufficiently alleged their "understanding" and "expectation" regarding defendant's performance as well as what "these understandings were based on" (quotation marks omitted)).

Given that class members' communications and interactions with Emory were not uniform, Emory would be entitled to inquire of each class member what the class member understood about the terms of the alleged implied contract and the basis for that understanding. To take just one example, Emory is entitled to ascertain whether a class member understood that Emory's "customary practice" included canceling classes in response to extreme weather events, and what the class member thereby understood about Emory's right to suspend in-person instruction in response to extraordinary circumstances impacting student safety. The need for such individualized inquiries precludes class certification. *See Vega*, 564 F.3d at 1272–74; *see also, e.g.*, *Rockford Principals &*

*Supervisors Ass'n v. Bd. of Educ. of Rockford Sch. Dist. No. 205*, 721 F. Supp. 948, 950 (N.D. Ill. 1989) (because an implied contract "requires mutual assent," which is "not present unless both parties intended to contract," "[d]etermining whether the plaintiffs were aware of and accepted the defendants' [alleged] offer" would require "individualized proof").

In opposing Emory's Rule 23(f) petition, plaintiff argued that "[c]lass members' subjective expectations are irrelevant" to the implied-contract claim. Opp. at 6, *Emory Univ.*, No. 23-90016 (11th Cir. July 10, 2023), ECF 9. That is incorrect. For that point, plaintiff cited *Mahon v. Chicago Title Insurance Co.*, 296 F.R.D. 63 (D. Conn. 2013), but that case is inapposite. There the defendant was required by law to charge each class member "its statutorily mandated rates," so there was no need for an individual inquiry into the terms of each class member's implied contract. *Id.* at 77–78. Here, by contrast, no statute required Emory to hold classes in person during a pandemic, and whether Emory implicitly promised each class member that it would do so is an inherently individualized inquiry. *See Vega*, 564 F.3d at 1273–74 (testimony in which some class members "attested [that] their understanding" of

contract terms differed from plaintiff's confirmed "the existence of significant individualized issues").

In short, if the class-certification order stands, the district court will need to undertake a highly individualized review of, among other things, what marketing and enrollment materials each class member saw and relied on, what the class member knew about Emory's customary practices, what promises on Emory's behalf could reasonably be inferred from those materials and information, and what the class member subjectively understood from that objective evidence. The district court abused its discretion in certifying the class despite these overwhelmingly individualized issues.

## II.  Common issues do not predominate because plaintiff failed to present a viable classwide damages model.

The district court, noting the potential for individual damages issues to overwhelm any common questions, correctly concluded that plaintiff could not show predominance without presenting a classwide damages model. But instead of rigorously analyzing plaintiff's approach to damages, the court accepted the unverified say-so of plaintiff's expert, Dr. Macartney, that his extraordinarily vague and general approach would suffice. And the court did so without giving meaningful

consideration either to Emory's countervailing expert report or to a case that rejected Dr. Macartney's approach on facts materially indistinguishable from those present here. Had the district court undertaken a properly rigorous analysis, it would have seen that plaintiff's damages approach is neither capable of measuring damages classwide nor consistent with his theory of liability.

### A.    The district court failed to undertake a rigorous analysis of plaintiff's damages approach.

Meeting Rule 23(b)(3)'s predominance requirement will often require the plaintiff to establish "that damages are capable of measurement on a classwide basis" using a common methodology. *Comcast*, 569 U.S. at 34. To be sure, individual damages issues "do not *always* defeat predominance." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016) (emphasis added). But if damages are not capable of classwide determination, then "individual damage calculations" may "overwhelm questions common to the class." *Comcast*, 569 U.S. at 34; *see also Brown*, 817 F.3d at 1239–40.

Here, the district court correctly held that plaintiff could not carry his burden to prove predominance without presenting "a classwide model capable of determining damages." R.98 at 22. As the court explained, a

35

classwide model was necessary because without one "individualized issues [would] abound" with respect to damages—for example, whether a given student planned to attend all in-person classes or a mix of in-person and remotely provided classes, and whether the "differing academic curricula for each of [Emory's] nine units, their respective unique responses to COVID-19, and their subsequent transitions to online learning in Spring 2020" impacted individual students differently. R.98 at 20–21; *see also* R.86-3 at 42–46 (Emory's expert, Dr. Wilner, explaining that "an individualized inquiry would be needed to determine any alleged damages for each putative class member"). The court was therefore right to acknowledge that, without an appropriate classwide model, damages would "present individualized issues that make classwide resolution of the claims improper." R.98 at 19.

But instead of engaging in the required "rigorous analysis" of whether plaintiff's proposed classwide damages methodologies were viable, *Comcast*, 569 U.S. at 34–35 (quoting *Wal-Mart*, 564 U.S. at 351), the district court undertook no analysis of that question at all. The court recognized that plaintiff's damages presentation was so inadequate that it verged on "abandonment of the issue." R.98 at 24. Yet it nonetheless

36

held that plaintiff had carried his burden simply by submitting, after his reply, "a rebuttal report from Macartney that *purport[ed]* to refute Wilner's contentions." *Id.* (emphasis added). The court did not consider and weigh the experts' competing arguments or make any finding that Dr. Macartney's were valid.

That is reversible error. "[A] district court errs as a matter of law when it fails to resolve a genuine legal or factual dispute relevant to" the Rule 23 requirements. *Brown*, 817 F.3d at 1233–34, 1237 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008), *as amended* (Jan. 16, 2009)); *see also Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010) (per curiam) ("[A] district court must … decide all relevant contested issues *prior to* certification." (emphasis added)). At a minimum, a rigorous analysis requires the court to "weigh[] conflicting expert testimony" and "declare a … tentative winner." *Sher v. Raytheon Co.*, 419 F. App'x 887, 890 (11th Cir. 2011).

The Seventh Circuit recently vacated a class-certification order in a similar case for exactly this reason, holding that the district court abused its discretion by failing to "confront [the university's] key arguments" regarding the adequacy of the plaintiff's damages model.

*Eddlemon v. Bradley Univ.*, 65 F.4th 335, 340 (7th Cir. 2023). The Seventh Circuit found inadequate the "scant analys[i]s" reflected in the district court's opinion and rejected the district court's unexplained "confiden[ce]" that plaintiff would ultimately "be able to fashion an appropriate formula for damages." *Id.* (quotation marks omitted). Such confidence is even more misplaced here, where the district court observed that plaintiff's failure to respond to Emory's arguments concerning damages was so egregious that plaintiff had come close to abandoning the issue.

Not only did the district court fail to weigh the experts' arguments, it also improperly shifted the burden to Emory to produce "authority *binding* on this Court that would *compel* a finding of a failure to show classwide damages." R.98 at 24–25 (emphases added). Emory bears no such burden. As this Court has held, "our constitutional tradition of individual litigation" dictates that "the presumption is *against* class certification" and "the party *seeking* class certification has the burden of proof." *Brown*, 817 F.3d at 1233 (first emphasis added). This means that "if doubts remain about whether the standard is satisfied," the class cannot be certified. *Id.* Insisting that a defendant opposing class

certification produce binding authority rejecting a plaintiff's damages model would convert class certification from an exception to the default rule and bless any damages approach, no matter how fanciful or abstract, so long as this Court has never squarely rejected it. That is not the law. *Id.*; *see also Comcast*, 569 U.S. at 33–34 (requiring plaintiff to "'affirmatively demonstrate his compliance' with Rule 23" (quoting *Wal-Mart*, 564 U.S. at 350)).

### B. Plaintiff's failure to present a viable classwide damages model precludes class certification.

If the district court had performed the required rigorous analysis, that analysis would have shown that plaintiff failed to identify a viable classwide damages model and, therefore, failed to prove that common issues would predominate over individual ones. That is so for at least three reasons.

***First***, plaintiff did not present a classwide damages model at all—just promises to figure out a model later. He relied entirely on Dr. Macartney, who merely provided broad, general descriptions of two economic methods—"hedonic regression" and "conjoint analysis"—that he asserted "could be used" to determine damages at a later stage. R.78-4 ¶¶ 15–16, 52; *see* R.77-1 at 17–18. As Dr. Wilner pointed out in his

report rejecting Dr. Macartney's approach, "[t]hese methodologies are so broad that [Dr. Macartney's] contention is akin to him stating that he can calculate damages because mathematics and financial statements exist." R.86-3 at 19.[4]

The district court could not reasonably conclude that Dr. Macartney's vague gesture in the direction of some possible damages methodologies sufficed to prove "that damages are susceptible of measurement across the entire class." *Comcast*, 569 U.S. at 35. Although the court rightly demanded a "classwide model capable of determining damages," R.98 at 22, it failed to apply that requirement in any meaningful way. By presenting a damages approach (actually, multiple approaches) devoid of any detail, plaintiff failed to provide any "model" at all, much less one that was "capable of determining damages" across the entire class. As the *Comcast* Court explained, allowing such a *laissez-*

---

[4] *See also In re Univ. of San Diego Tuition & Fees COVID-19 Refund Litig.*, 2023 WL 3773942, at *4 (S.D. Cal. May 23, 2023) (finding that Dr. Macartney's report in another COVID-related case "provided [his] summarization of the two potential methodologies" but "never actually provide[d] any insight into which of the methodologies Dr. Macartney will execute," and that it "read[] more like a scholarly treatise on the two methodologies than a report providing an expert opinion on the damages purportedly owed to the class").

*faire* approach at class certification would mean that "*any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be," which would spell the end of the rigorous predominance requirement.  569 U.S. at 36.

**Second**, the district court erred by refusing to consider a decision by another district court that rejected the *same* damages approach presented by the *same* expert in a similar case about a university's transition to online instruction during the COVID-19 pandemic.  *See Michel v. Yale Univ.*, 2023 WL 1350220 (D. Conn. Jan. 30, 2023).  That decision further confirms that plaintiff has no viable damages model.

In *Michel*, a student brought claims based on Yale's transition from in-person to online instruction during the Spring 2020 semester.  Like plaintiff here, the student claimed as damages "the difference in value between the remote instruction he received and the in-person instruction he believes he was promised."  *Id.* at *6 (quotation marks omitted); *cf.* R.98 at 25 (noting that plaintiff here claims as damages "the difference between what each class member paid and the market value of the education they received" (quoting *Arredondo v. Univ. of La Verne*, 341 F.R.D. 47, 53 (C.D. Cal 2022), *class decertified in part*, 618 F. Supp. 3d

41

937 (C.D. Cal. 2022)).  And like plaintiff here, the student in *Michel* submitted an expert report from Dr. Macartney, who "propose[d] two methodologies for calculating the disparity in the value"—using either hedonic regression ("data stemming from surveys of the preferences of Yale students") or conjoint analysis ("data from different colleges' tuition and fees and the different institutions' attributes").  2023 WL 1350220, at *7 (quotation marks omitted).  Dr. Macartney's reports in the two cases are virtually identical.  *Compare* Decl. of Gareth Macartney, Ph.D., *Michel*, No. 3:20-cv-1080 (D. Conn. Aug. 19, 2022), ECF 131-4, *with* R.78-4 (Macartney Report).

Yale moved for summary judgment, arguing (among other things) that the plaintiff had failed to put forward sufficient evidence to allow a jury to determine that he had been damaged or to calculate any damages he might have suffered.  The district court agreed and granted summary judgment in Yale's favor because "there is no evidence in the record from which a reasonable juror could calculate the financial detriment Michel experienced."  2023 WL 1350220, at *7.  The court found that Dr. Macartney's proposed methods "would ignore that Yale has assessed the value of its in-person and online offerings prior to the pandemic and opted

42

to charge students an identical fee for either mode of instruction." *Id.* It explained that "there is only one Yale University in downtown New Haven," and "attempting to divine a difference in market value" between a Yale education with in-person classes and one with remote classes "is unavailing where Yale's pricing model has previously rejected a value disparity for the in-person and remote educational opportunities it provides." *Id.*

That reasoning also applies here. There is only one Emory University, and like Yale, Emory has rejected a value disparity for its in-person and remote educational offerings. As Dr. Wilner explained, Emory historically has not charged different tuition for students during the typical fall/spring semesters depending on whether they attend classes in person or remotely. R.86-3 at 28–32. And Emory charged at least as much in tuition for the Fall 2020 semester as it did for the Spring 2020 semester—even though students knew that at least some of their Fall 2020 classes would be online, and even though they signed an agreement acknowledging that no tuition would be refunded in the event of a full transition to remote instruction. R.86-3 at 26–28; *see also* R.85-20 at 156:19–159:15. Notably, more than 90% of non-graduating

43

students—including plaintiff's daughter—chose to re-enroll on those terms, a percentage that is consistent with typical re-enrollment. R.86-3 at 26–28; *see also Dixon*, 75 F.4th at 1211 (where plaintiff did "not allege[] that she paid (or should have paid) any less for [a] Fall 2020 online experience than she did for her Spring 2020 semester," "the value of … her tuition payment … does not appear to be out of step with the value that she places on the benefit she received in return"); *Legacy Acad., Inc. v. JLK, Inc.*, 765 S.E.2d 472, 478–79 (Ga. Ct. App. 2014) ("[T]he best measure of the value of [a] broken promise is the value assigned to it by the parties themselves." (quotation marks omitted)).

The district court dismissed *Michel* because it "weighed the merits of the proposed classwide damages model at the summary judgment stage, unlike the Court's inquiry here at the class certification stage." R.98 at 25. That is the same fallacy the Supreme Court rejected in *Comcast*. There, too, the lower courts refused to scrutinize plaintiffs' damages methodology on the ground that doing so "would involve consideration of the 'merits' having 'no place in the class certification inquiry.'" 569 U.S. at 35 (quoting *Behrend v. Comcast Corp.*, 655 F.3d 182, 206–07 (3d Cir. 2011)). The Supreme Court reversed and held that

44

"refusing to entertain arguments against respondents' damages model that bore on the propriety of class certification, simply because those arguments would also be pertinent to the merits determination, … ran afoul of our precedents requiring precisely that inquiry." *Id.* at 34; *see also Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1190 (11th Cir. 2009) (courts "can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied" (quotation marks omitted)).[5]

**Third**, plaintiff's proposed methodology runs afoul of *Comcast* for another reason: It is not consistent with his remaining theory of liability. *See Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 988 (11th Cir. 2016) (*Comcast* "requires that 'any model supporting a plaintiff's damages case must be consistent with its liability case'" (quoting *Comcast*, 569 U.S. at 35)).

---

[5] In opposing Emory's Rule 23(f) petition, plaintiff suggested that *Michel* had been "supersed[ed]" by *Rynasko v. New York University*, 63 F.4th 186 (2d Cir. 2023). *See* Opp. at 14–15, *Emory Univ.*, No. 23-90016. That is incorrect. *Rynasko* held at the motion-to-dismiss stage that an individual plaintiff had sufficiently pleaded an implied-contract claim; it did not address whether she had identified a reliable model for calculating classwide (or even individual) damages.

As the district court recognized, Georgia courts defer to universities' management of their academic affairs and refrain from deciding claims regarding the value or quality of the educational experiences a school provides.  R.44 at 9–10; *see also Woodruff v. Ga. State Univ.*, 304 S.E.2d 697, 698–99 (Ga. 1983); *Jansen v. Emory Univ.*, 440 F. Supp. 1060, 1062 (N.D. Ga. 1977).  The district court thus held that plaintiff could not seek damages on the theory that Emory's transition to remote learning resulted in "a poorer educational experience."  R.44 at 10.  But that is *exactly* what Dr. Macartney's model purports to measure: the loss of value students allegedly suffered as a result of—in his words—"receiving an inferior experience compared to what they paid for."  R.78-4 ¶ 14. *Comcast* makes clear that such a mismatch between a plaintiff's theory of liability and its classwide damages model defeats certification.

The district court rejected this argument in a footnote, declaring that measuring damages based on an alleged diminution in the "market value" of Emory's educational program would not entail impermissible second-guessing of the quality or value of that program.  *See* R.98 at 25 n.1.  But the court did not address the central role that Dr. Macartney's claims about the supposedly inferior quality of remote education play in

his damages model. *See, e.g.*, R.78-4 ¶¶ 17–49. For example, Dr. Macartney's claim that in-person education has a higher "market value" than online learning reflects, at least in part, what he calls a "perception that [in-person education] is associated with better outcomes." R. 78-4 ¶ 32.

Moreover, in barring claims about the quality of a university's program but allowing claims about its "market value," the district court drew a hair-splitting distinction that undermines Georgia's rule that "educational contracts … are to be construed in a manner which leaves the school sufficient discretion to 'properly exercise its educational responsibility.'" *Jansen*, 440 F. Supp. at 1062. The reality is that a trial based on Dr. Macartney's "market value" model would inevitably impinge on that discretion by requiring Emory to defend the educational value of its remote learning program, and by requiring the jury to decide whether that program provided "a poorer educational experience," R.44 at 10, as compared to in-person classes. A judicial decree that a university's academic program is worth less than what the university charges is no less intrusive just because it is couched in terms of "market value." If a plaintiff's criticism of a university's programmatic decisions can be

transformed into a justiciable claim just by framing that criticism as an argument that the university's choices made its educational offerings less valuable in the eyes of "the market," then Georgia's rule would be toothless indeed.

*    *    *

For all these reasons, this Court should hold that plaintiff's failure to present a viable classwide damages model prevents him from establishing predominance under Rule 23(b)(3). And, to be clear, the Court should not merely remand for further consideration on this issue. Given plaintiff's fundamental failure to present a classwide damages model consistent with his theory of liability, as he was required to do under *Comcast*, the Court should reverse and deny class certification.

## III. The district court abused its discretion by certifying a class without resolving concerns about its manageability.

Before certifying a class under Rule 23(b)(3), district courts are required to consider "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). In *Cherry v. Dometic Corp.*, 986 F.3d 1296 (11th Cir. 2021), this Court held that, "as part of the manageability criterion of Rule 23(b)(3)(D)," district courts must consider whether the class is administratively feasible, *i.e.*, whether there is a "'manageable

48

process'" for identifying class members without the need for "'individual factual inquir[ies].'" *Id.* at 1301–04 (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 308 (3d Cir. 2013)). Although the Court stopped short of making administrative feasibility an absolute prerequisite to certification, it made clear that difficulties in identifying class members "remain[] relevant to whether a proposed class may proceed." *Id.* at 1301–02. That makes sense, as a class action rife with manageability issues is unlikely to be "superior" to traditional named-parties-only litigation, and common issues are unlikely to predominate where highly individualized inquires are needed even to identify class members. *See* Fed. R. Civ. P. 23(b)(3).

This case is a prime example. In its class-certification order, the district court recognized that the class presents "unusually difficult manageability problems" that engender "serious doubts as to whether ascertaining the putative individual class members … is a manageable endeavor." R.98 at 29 (quotation marks omitted). The court's doubts were well founded. The class is not limited to Emory students, but includes anyone who made a tuition payment on a student's behalf. Emory's records, however, "do not specifically identify the individual

people paying Emory tuition and fees on behalf of others." *Id.*; *see also* R.85-37 ¶¶ 9–18; R.86-4 at 241:13–246:4; R.85-35; R.85-36. So "[a]scertaining the identities of class members will … require individual inquiries" into *every tuition payment* made on behalf of each of Emory's roughly 15,000 students in order to determine who made the payment— the student themself, a parent or relative, a scholarship provider, or some other third party. R.98 at 8.

That forensic inquiry will not be simple (and may even prove impossible). It may require, among other things, individually examining Emory's payment records and the records of issuing banks; attempting to determine the source of funds for payments made through college savings plans (*e.g.*, 529 accounts); and accounting for scholarships and other funds that may have been paid directly to the student or parent. Plaintiff's daughter's account exemplifies these problems: She benefited from online tuition payments for which there are no records identifying the source; she received tuition payments from an anonymous 529 account; and she received scholarship payments that she believes were made directly to her or her parents (and which are therefore not reflected in Emory's records). *See* R.85-2 at 167:5–168:10; R.85-15 at 82:23–86:8.

Similar problems have led other courts hearing lawsuits over COVID-related campus closures to refuse to certify classes of all tuition-payors. *See, e.g.*, *Evans*, 2023 WL 3262012, at *3 (affirming class certification denial where "BYU lacked records showing who had paid tuition for individual students"); *Garcia De León v. N.Y. Univ.*, 2022 WL 2237452, at *4 (S.D.N.Y. June 22, 2022) (denying class certification where "NYU's account statements do not specify … [who] actually paid"). Indeed, even courts that have certified more limited classes have recognized that a class containing third-party payors, like the one here, would be overbroad and could not be certified. *See Arredondo v. Univ. of La Verne*, 618 F. Supp. 3d 937, 949 (C.D. Cal. 2022); *Little v. Grand Canyon Univ.*, 2021 WL 4263715, at *2 (D. Ariz. 2021). The district court's decision, in fact, appears to stand alone on this issue: to date, plaintiff has identified no other decision (outside of the settlement context) granting certification of a payor class in a suit based on pandemic-related campus closures.

The district court acknowledged these difficulties, yet it granted class certification anyway. Instead of addressing its stated concerns about manageability *before* certification, the court rushed to certify the

class while ordering plaintiff to submit a post-certification "plan for identifying members of the class, notifying class members of the present action, and managing the case." R.98 at 29. What unfolded next was predictable: Plaintiff submitted a "plan" that was devoid of detail and only confirmed that proceeding with the certified class would not be a manageable endeavor. R.99. Emory responded, pointing out numerous problems with plaintiff's so-called plan. R.100. The district court construed Emory's response as a motion to decertify the class, *see* R.101, and that motion is still pending as of the filing of this brief.

By proceeding in this way, the district court abused its discretion. "A district court must conduct a rigorous analysis of the rule 23 prerequisites *before* certifying a class," not after. *Vega*, 564 F.3d at 1266 (emphasis added) (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)); *cf. Cordoba*, 942 F.3d at 1275, 1277 (district court must consider "before certification" whether "there is a plausible straightforward method" to identify injured class members). And a court that "has doubts about whether 'the requirements of Rule 23 have been met should refuse certification until they have been met.'" *Brown,* 817 F.3d at 1233–34 (quoting Fed. R. Civ. P. 23 advisory committee's note to

2003 amendment).  Promising to consider manageability concerns *after* certification is no substitute for addressing those concerns *before* certification—not least because the denial of a post-certification motion to decertify a class is ordinarily not reviewable under Rule 23(f).

Here, traditional named-parties-only litigation would solve the manageability problems the district court identified—and others to boot. While Emory does not know the identities of tuition payors, if a payor were to bring an individual lawsuit, the problems the district court identified would disappear.  Further, those payors are in a better position than plaintiff to explain what they understood about the existence and terms of any implied contract with Emory and what objective facts gave rise to those understandings.  *See* Part I, *supra*.  In any event, where, as here, administrative difficulties threaten to render the class unmanageable, failing to address that concern before certification is an abuse of discretion.

## CONCLUSION

This Court should reverse the district court's class-certification order.

Respectfully submitted,

*s/ Paul Alessio Mezzina*

| | |
|---|---|
| David L. Balser | Paul Alessio Mezzina |
| Brandon R. Keel | Joshua N. Mitchell |
| Timothy Lee | KING & SPALDING LLP |
| Elliott A. Foote | 1700 Pennsylvania Avenue NW |
| KING & SPALDING LLP | Washington, DC 20006 |
| 1180 Peachtree Street NE | (202) 737-0500 |
| Atlanta, GA 30309 | pmezzina@kslaw.com |
| (404) 572-4600 | |

*Counsel for Appellant*

November 16, 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 10,451 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 14-point font.

Date: November 16, 2023

_s/Paul Alessio Mezzina_
Paul Alessio Mezzina

_Counsel for Appellant_

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2023, the foregoing was filed with the Clerk of the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system, which will cause a notice of electronic filing to be served on all registered counsel of record.

*s/Paul Alessio Mezzina*
Paul Alessio Mezzina

*Counsel for Appellant*